STATE OF NORTH CAROLINA v. DARRYL ROBIN TAYLOR

No. COA03-334

(Filed 17 August 2004)

**1. Evidence— expert testimony—blood alcohol extrapolation**

The admission of expert testimony about an impaired driving defendant's alcohol concentration at the time of an automobile accident was not an abuse of discretion even though the witness used an average alcohol elimination rate when doing a retrograde extrapolation. Moreover, there was other evidence sufficient for a DWI conviction in the observations of the officer who arrested defendant; driving while impaired can be established by either blood alcohol level or the opinion of a highway patrolman.

**2. Appeal and Error— plain error review—instructions and evidence only**

Plain error review did not apply to an argument concerning information revealed to the jury by the judge just before the jury was polled. Plain error doctrine is limited to jury instructions and evidentiary matters.

Judge TYSON concurring in result.

Appeal by defendant from judgment dated 12 September 2002 by Judge L. Todd Burke in Superior Court, Forsyth County. Heard in the Court of Appeals 27 January 2004.

*Attorney General Roy Cooper, by Special Deputy Attorney General Isaac T. Avery, III and Assistant Attorney General Patricia A. Duffy, for the State.*

*Jarvis John Edgerton, IV for defendant-appellant.*

McGEE, Judge.

Darryl Robin Taylor (defendant) was indicted on 24 September 2001 by the Forsyth County grand jury for habitual impaired driving in violation of N.C. Gen. Stat. § 20-138.5. Defendant stipulated pre-trial to his three prior convictions of driving while impaired. Defendant was convicted of driving while impaired on 11 September 2002. The trial court found defendant to have a prior record level IV and sentenced defendant to a minimum term of twenty-two months and a maximum term of twenty-seven months in prison. Defendant appeals.

STATE v. TAYLOR

[165 N.C. App. 750 (2004)]

The State's evidence at trial tended to show that Preston Browder (Browder) was traveling north on Highway 66 in Rural Hall, North Carolina, in his 1984 GMC truck on 15 March 2001 at approximately 1:00 p.m. As Browder was driving, he saw a van driven by defendant coming towards him. The van was traveling south but was entirely in Browder's northbound lane. Browder testified that defendant "was slumped over like he was asleep." In an effort to avoid being hit by defendant's van, Browder "made a quick right." However, defendant's van hit Browder's truck on the driver's side and "turned [Browder] around in a private driveway." Browder testified that after the collision, defendant walked over to Browder's truck and apologized to Browder. Defendant came "within five feet" of Browder but not close enough for Browder to determine whether defendant had been drinking.

Trooper M.W. Davis (Trooper Davis) of the N.C. State Highway Patrol testified that he responded to the accident around 1:10 p.m. and observed defendant's van facing south but located in the northbound lane. Browder's vehicle was facing west in a driveway on the shoulder of the northbound lane. Trooper Davis approached defendant's van and asked defendant for his driver's license and registration. Trooper Davis testified that defendant responded by "look[ing] at [him] with a blank face and then [defendant] started fumbling through some papers." Trooper Davis noticed a "strong odor of alcohol" and "had to assist [defendant]" in getting to the patrol car. Defendant filled out a voluntary statement and Trooper Davis "barely [could] make [the statement] out" due to defendant's failure to write on the appropriate lines. When asked the reason for the collision, defendant stated that he had fallen asleep.

After defendant's statement was completed, Trooper Davis administered two Alcosensor tests and had defendant perform a "walk-and-turn" test and a "sway test." Defendant was "swaying off the line" with the walking test and was "swaying side to side" with the sway test. Trooper Davis arrested defendant for driving while impaired and took him to the "Forsyth County Breathalyzer room" in the county jail. Upon arrival, Trooper Davis searched defendant and found ten empty packages of Guaifenesin tablets, which defendant stated helped him with his breathing problems. Before administering a breathalyzer test, Trooper Davis administered two additional performance tests. At 3:18 p.m., defendant submitted to the first breathalyzer test, which showed an alcohol concentration of 0.05.

STATE v. TAYLOR

[165 N.C. App. 750 (2004)]

Paul Glover (Glover), a research scientist and training specialist with the forensic tests for alcohol branch of the North Carolina Department of Health and Human Services, testified as an expert in breath and blood alcohol testing, blood alcohol physiology and pharmacology, and the effect of drugs on human performance and behavior. Glover testified that he performed a retrograde extrapolation and determined that defendant's alcohol concentration at the time of the collision was 0.08. Glover further testified about the combined effect of alcohol and Guaifenesin. Defendant presented no evidence.

We first note that defendant has failed to present an argument in support of assignments of error numbers one, two, four, five, six, seven, eight, nine, and eleven and they are deemed abandoned pursuant to N.C.R. App. P. 28(b)(6).

[1] Defendant argues in assignment of error number three that the trial court erred in allowing Glover's testimony that defendant's blood alcohol content at the time of the crash was 0.08, based on an average alcohol elimination rate of 0.0165. Glover utilized a retrograde extrapolation method to determine defendant's alcohol concentration at the time of the accident. The alcohol elimination rate used by Glover in this calculation was an average rate of 0.0165. Defendant argues that because the elimination rate was based on an average, rather than defendant's specific rate, the conclusion of defendant's alcohol content level at the time of the collision was "without foundation, speculative, and mislead[ing] [to] the jury[.]" For the reasons stated below, we find this argument to be without merit.

Defendant contends that the average rate used by Glover "applied a rate of elimination derived from the average rate found in a sample of 'drinking drivers' during roadside tests." Defendant argues that the rate of elimination used for defendant was actually derived by presuming that defendant "falls in [a] class of people labeled 'drinking drivers[.]' " However, we note that defendant's assertion is incorrect. Rather, Glover testified that he used a "conservative rate" that is "less than what has been reported in drinking drivers." Further, Glover specifically agreed that the average rate he used is lower than the rates from published studies concerning alcohol abusers and persons who drink and drive.

We note at the outset that "[i]t is well-established that trial courts must decide preliminary questions concerning . . . the admissibility of expert testimony." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citing N.C. Gen. Stat. § 8C-1, Rule

104(a) (2003)). "[T]rial courts are afforded 'wide latitude of discretion when making a determination about the admissibility of expert testimony.'" *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686 (quoting *State v. Bullard*, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984)). Thus, "a trial court's ruling on . . . the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion." *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686.

*Howerton* sets forth the applicable three-step inquiry from *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995) concerning the admissibility of expert testimony: "(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686 (internal citations omitted).

Regarding the first step, "when specific precedent justifies recognition of an established scientific theory or technique advanced by an expert, the trial court should favor its admissibility, provided the other requirements of admissibility are likewise satisfied." *Id.* at 459, 597 S.E.2d at 687. Our Court has "accepted the reliability of extrapolation evidence since 1985." *State v. Davis*, 142 N.C. App. 81, 90, 542 S.E.2d 236, 241, *disc. review denied*, 353 N.C. 386, 547 S.E.2d 818 (2001). However, defendant indicates that he "is not challenging the reliability of blood extrapolation science or the general admissibility of such evidence." Rather, defendant challenges Glover's testimony on the ground that it lacked sufficient foundation since the alcohol elimination rate used by Glover when extrapolating was an average rate rather than defendant's actual elimination rate.

Defendant cites a 19 November 2002 unpublished opinion by this Court, *State v. Swain* (COA02-6), in acknowledging that "the science of blood alcohol extrapolation can yield specific conclusions about a defendant if two tests are done to measure that person's particular rate of elimination." In *Swain*, the defendant's blood alcohol level was tested at two separate points after a car accident. Based on these values, an expert used the extrapolation method to determine the defendant's blood alcohol level at the time of the accident. The implication in *Swain* is that the expert determined the defendant's actual rate of elimination by testing him at two separate intervals. In contrast, defendant in the case before us was only tested once after the accident. Based on this level and an *average* elimination rate, Glover testified to defendant's blood alcohol level at the time of the accident.

Our Court addressed the very issue of whether an average elimination rate can be used for an extrapolation calculation in *State v. Catoe*, 78 N.C. App. 167, 336 S.E.2d 691 (1985), *disc. review denied*, 316 N.C. 380, 344 S.E.2d 1 (1986). In *Catoe*, the defendant argued that the trial court erred in allowing the expert witness to testify that the average person displays a certain rate of decline in blood alcohol content in the hours after the last consumption of alcohol, and that based on that average rate of decline (*i.e.*, elimination rate), the expert witness determined what the defendant's blood alcohol content would have been at the time of the accident. *Catoe*, 78 N.C. App. at 168, 336 S.E.2d at 692. The specific average elimination rate which was used is not indicated in *Catoe*. However, this Court found that the trial court did not err in admitting the expert's testimony despite the use of an average elimination rate. *Id.* at 168-69, 336 S.E.2d at 692-93.

Our Court reasoned in *Catoe* that the expert testified that he had done experiments to determine the average rate of blood alcohol elimination and had arrived at an average rate "which matched that observed by many other nationally and internationally known scientists in [the expert's] field." *Id.* at 169, 336 S.E.2d at 692. Although the expert admitted that a deviation from the average was possible in individual cases, he testified that "his data were very consistent across the various subcategories of the population." *Id.* Based on this information, our Court concluded in *Catoe* that the expert's testimony was sufficiently reliable and the trial court did not abuse its discretion in admitting it. This Court further held that the possibility of minor variations "went to the weight, not the admissibility of [the expert's] testimony." *Id.* at 169, 336 S.E.2d at 693. We view *Catoe* as the type of "specific precedent" indicated in *Howerton* which is meant to encourage a trial court to favor the admissibility of extrapolation evidence based on an average elimination rate.

Our case is similar to *Catoe* because Glover used an average elimination rate of 0.0165 in his extrapolation calculation to determine defendant's blood alcohol level at the time of the accident. Glover thoroughly explained the steps of an extrapolation calculation: (1) determine the amount of time that has elapsed between the collision and the actual breathalyzer test; (2) multiply the amount of elapsed time by the rate of alcohol elimination from the body, which represents the amount of alcohol that has been eliminated since the time of the collision; and (3) add the amount of eliminated alcohol to the breathalyzer test result. This figure represents what the person's blood alcohol content would have been at the time of the collision.

Glover stated that extrapolation is possible "because we know that humans eliminate alcohol at a fairly predictable rate." Glover admitted that elimination rates vary "depending on a person's experience with alcohol" but stated that "there are elimination rates that have been published for over 65 years that have gained acceptance in the scientific community" which make extrapolation possible. Glover elaborated on how rates can vary and then stated that a "very conservative rate" is used for calculations in North Carolina. Glover described the 0.0165 rate as a conservative rate which tends to "favor the final result because it's going to give you a smaller number." When asked why he used this conservative rate, Glover responded, "because we don't know absolutely . . . a person's alcohol history necessarily[.]" This testimony established that the elimination rate used by Glover was not defendant's actual rate but rather an average rate.

In addition, we note that during Glover's testimony, he performed the actual calculation using the relevant figures in this case. Before multiplying 2.1 (the elapsed time) by 0.0165 (the elimination rate), he was asked, "[a]nd that would be the rate of elimination of alcohol from this defendant's body; is that correct?" Glover responded by saying "[c]orrect." However, in light of the detailed explanation about the process and the origin of the average elimination rate, the jury heard that 0.0165 was not defendant's actual elimination rate.

Further, when questioned about the origin of the rate he used, Glover said it originated with an individual named Professor Whitmark. Glover elaborated by stating that since 1935, a tremendous number of studies have been conducted to measure elimination rates. Those studies have agreed with the rate Professor Whitmark determined, with the exception that people with greater experience with alcohol have a faster elimination rate. Thus, as in *Catoe*, we conclude that the trial court did not err in admitting Glover's extrapolation testimony even though an average elimination rate was used for the calculation.

We note that the concurring opinion attempts to distinguish *Catoe* on the ground that unlike defendant in the case before our Court, the defendant in *Catoe* did not specifically object to the admission of the expert's testimony. However, we note that this failure to object in *Catoe* has no bearing on our analysis. Despite the lack of proper objection, this Court assumed the question was properly before it and concluded that the expert evidence was nonetheless properly admitted. *Catoe*, 78 N.C. App. at 168, 336 S.E.2d at 692.

We again note that defendant does not challenge the general admissibility of extrapolation evidence if the calculation is based on a defendant's specific elimination rate. However, defendant asserts that an extrapolation based on an average elimination rate is not the type of extrapolation that is generally admissible. Although we do not find this argument persuasive in light of *Catoe*, even if we assume that defendant is correct in his assertion that the type of extrapolation calculation done in this case is not generally admissible, we nonetheless hold that under *Howerton*, the trial court did not err in allowing the testimony.

As expressed in *Howerton*, under the first step of *Goode*, if "the trial court is without precedential guidance or faced with novel scientific theories, unestablished techniques, or compelling new perspectives on otherwise settled theories or techniques," the trial court must look to other " 'indices of reliability' to determine whether the expert's proffered scientific or technical method of proof is sufficiently reliable[.]" *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687 (quoting *State v. Pennington*, 327 N.C. 89, 98, 393 S.E.2d 847, 853 (1990)).

> This assessment does not, however, go so far as to require the expert's testimony to be proven conclusively reliable, or indisputably valid before it can be admitted into evidence. . . . Therefore, once the trial court makes a preliminary determination that the scientific or technical area underlying a qualified expert's opinion is sufficiently reliable (and, of course, relevant), any lingering questions or controversy concerning the quality of the expert's conclusions go to the weight of the testimony rather than its admissibility.

*Howerton*, 358 N.C. at 460-61, 597 S.E.2d at 687-88.

In light of the fact that defendant does not challenge Glover's qualification as an expert or the general relevance of extrapolation evidence, we need not address the second and third steps delineated above regarding the admissibility of expert testimony. Based on our discussion above, we hold that the trial court did not abuse its discretion in allowing Glover's testimony.

We also feel compelled to address *Hughes v. Vestal*, 264 N.C. 500, 142 S.E.2d 361 (1965), the case which the concurrence relies upon for the broad proposition that "[o]ur Supreme Court has rejected average data as evidence to show how a specific action may have occurred or how an individual may have reacted or responded in an 'actual set of circumstances.' " However, the *Hughes* Court merely concluded that

"charts and tables of stopping distances are incompetent and inadmissible" because such charts constitute hearsay, lack proper foundation, and because they "furnish[] no specific standards by which the facts of a particular case may be evaluated." *Hughes*, 264 N.C. at 505, 142 S.E.2d at 365. Further, in contrast to the case before our Court, *Hughes* did not involve the admission of expert testimony. Notably, however, the *Hughes* Court noted another case where "expert testimony as to the distance within which a certain truck could be stopped when going at a certain rate of speed was . . . admissible." *Id.* at 504, 142 S.E.2d at 364. For these reasons, we find that *Hughes* is not applicable to the case before us.

In addition, we note that N.C. Gen. Stat. § 20-138.1 governs the offense of impaired driving and provides that a person is guilty of the offense if he drives "(1) [w]hile under the influence of an impairing substance; or (2) [a]fter having consumed sufficient alcohol that he has, at any relevant time after the driving, an alcohol concentration of 0.08 or more." N.C. Gen. Stat. § 20-138.1(a) (2003). Thus, "the acts of driving while under the influence of an impairing substance and driving with an alcohol concentration of [.08] are two separate, independent and distinct ways by which one can commit the single *offense* of driving while impaired." *State v. Coker*, 312 N.C. 432, 440, 323 S.E.2d 343, 349 (1984). According to the pattern jury instructions, if "the evidence supports submission of the case under both alternatives . . . instructions on both alternatives should be given." N.C.P.I.—Crim. 270.20. The trial court specifically stated it would "adhere to the pattern instructions" and neither party objected. Subsequently, the instruction on impaired driving in this case tracked the language of the pattern instruction.

Although the primary value of Glover's testimony was to establish that defendant's blood alcohol content was above the statutory limit at the time of the collision, the State was not required to establish that level to prove that defendant was driving while impaired (DWI). *See State v. Sigmon*, 74 N.C. App. 479, 482, 328 S.E.2d 843, 846 (1985) (the defendant's blood alcohol content of 0.06 did not establish presumption that the defendant was not impaired; other evidence, principally the opinion of a highway patrolman, sufficed to convict). In fact, "the State may prove DWI where the [blood alcohol content] is entirely unknown or less than [0.08]." *State v. Harrington*, 78 N.C. App. 39, 46, 336 S.E.2d 852, 856 (1985). "The opinion of a law enforcement officer . . . has consistently been held sufficient evidence of impairment, provided that it is not solely based on the odor of alco-

hol." *State v. Mark*, 154 N.C. App. 341, 346, 571 S.E.2d 867, 871 (2002), *aff'd*, 357 N.C. 242, 580 S.E.2d 693 (2003).

In this case, there was evidence that Trooper Davis smelled an odor of alcohol on defendant's person at the accident scene, that defendant needed assistance with walking to the patrol car, that defendant had difficulty writing his statement on the appropriate lines, that defendant had a "blank face," and that defendant did not perform satisfactorily on field sobriety tests administered by Trooper Davis. Further, Trooper Davis gave his opinion that defendant "had consumed a sufficient amount of alcohol to impair both his mental and physical faculties to such an extent that appreciable impairment of either or both [of] his faculties was evident." This evidence was sufficient for a DWI conviction regardless of Glover's testimony. Thus, even if the admission of Glover's testimony was error, the error was not prejudicial.

[2] Defendant argues in assignment of error number ten that the trial court erred by publishing defendant's prior record level to the jury immediately before polling the jurors for their verdicts. Defendant argues that this error violated Rules 402 and 403 of the North Carolina Rules of Evidence because defendant's prior record had no relevance to the issue before the jury and was highly prejudicial information to be revealed to the jury. N.C. Gen. Stat. § 8C-1, Rules 402, 403 (2003). Defendant acknowledges that he failed to object at trial and accordingly asserts that plain error review is applicable. However, the North Carolina Supreme Court "has previously limited application of the plain error doctrine to jury instructions and evidentiary matters." *State v. Anderson*, 355 N.C. 136, 142, 558 S.E.2d 87, 92 (2002). Defendant's argument fits within neither of these limited situations. Defendant's plain error argument therefore fails and assignment of error number ten is overruled.

No error.

Judge WYNN concurs.

Judge TYSON concurs in the result with a separate opinion.

TYSON, Judge concurring in result only.

I concur in the result reached in the majority opinion to uphold defendant's driving while impaired conviction. I disagree with its con-

clusion that the trial court did not err in allowing Glover to testify that "defendant's" blood alcohol concentration at the time of the accident was 0.08 using a retrograde average extrapolation rate.

## I. Average Data

The State tendered evidence of an average alcohol elimination rate data to prove *defendant's* actual alcohol elimination rate and establish his blood alcohol concentration at the time of the accident. Unlike the defendant in *State v. Catoe*, defendant here specifically objected to Glover's qualifications and argued that his testimony lacked foundation. 78 N.C. App. 167, 168, 336 S.E.2d 691, 692, *disc. rev. denied*, 315 N.C. 186, 338 S.E.2d 107 (1985) (expert's qualifications were "not contested" and "[d]efendant's objections to the contested testimony were only general."); *see also State v. Davis*, 142 N.C. App. 81, 90, 542 S.E.2d 236, 241, *disc. rev. denied*, 353 N.C. 386, 547 S.E.2d 818 (2001) ("Defendant did not object to [the expert's] qualifications."). Since we held in *Catoe*, "[t]he assignment [of error] is not properly before this Court," the remaining discussion in the opinion is *obiter dicta* and is not binding as precedent at bar. 78 N.C. App. at 168, 336 S.E.2d at 692.

The trial court admitted, over defendant's specific objection, Glover's testimony that "defendant's" elimination rate was 0.0165 and also that "defendant" had a 0.08 at the time of the accident. Glover relied on "an average extrapolation rate," pure hearsay, instead of defendant's *actual* elimination rate to reach his conclusions. Glover failed to establish any connection or common attributes to correlate the average extrapolation rate to defendant's actual rate to establish relevancy.

Recently, our Supreme Court clarified the test for admissibility of expert testimony:

The most recent North Carolina case from this Court to comprehensively address the admissibility of expert testimony under Rule 702 is *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995), which set forth a three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? *Id.* at 527-29, 461 S.E.2d at 639-40. (2) Is the witness testifying at trial qualified as an expert in that area of testimony? *Id.* at 529, 461 S.E.2d at 640. (3) *Is the expert's testimony relevant*? *Id.* at 529, 461 S.E.2d at 641.

*Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (emphasis supplied). Defendant argues Glover laid no foundation for his testimony because he failed to show any relevance in using the average rate data as it applied to defendant. I agree. The use of average elimination data, instead of defendant's actual elimination rate, is hearsay, irrelevant, and inadmissible under our Supreme Court's holdings in *Goode* and *Howerton*.

Our Supreme Court has rejected average data as evidence to show how a specific action may have occurred or how an individual may have reacted or responded in an "actual set of circumstances." *Hughes v. Vestal*, 264 N.C. 500, 505, 142 S.E.2d 361, 365 (1965). In *Hughes*, our Supreme Court addressed the admission into evidence of a chart showing average stopping distances. The Court rejected the use of these charts at trial and held:

> A formula, in which so many components are variables and in which there is only one constant (rate of speed), cannot by projection of a positive result (distance), based on speculative averages, be of sufficient accuracy and relevancy to rise of its own force to the dignity of evidence in an actual set of circumstances. This and its hearsay character have led to its rejection as evidence in a large majority of the jurisdictions where the question has been directly raised.

*Id.* The Court stated, "The factors involved in stopping automobiles are so many and varied that a fixed formula is of slight, if any, value in a given case." *Id.* The Court reiterated that numerous variables affect the outcome in specific situations, including the vehicle's weight, condition of tire tread, force of brakes, and types of roadways. *Id.*

Similarly, Glover admitted that numerous variables exist to determine an individual's alcohol elimination rate, including, among other things, a person's: (1) gender; (2) height; (3) weight; (4) age; (5) elapsed time since eating; (6) "recent consumption" of alcohol; (7) type of alcohol consumed; and (8) "a person's experience with alcohol." Glover testified that an individual's elimination rate "could be different within a given individual on different days." Glover further testified that "the ideal way [to know defendant's elimination rate] would be to get multiple samples at the time of the event, the arrest or the crash . . . [or] do a controlled experiment where you . . . measured it." Glover neither identified nor correlated any similarities between defendant and those out of court persons

tested during the experiments that collectively led to the "average" elimination rate.

In *Catoe*, we recognized, "usual constraints of relevance continue to apply." 78 N.C. App. at 170, 336 S.E.2d at 693. Average data is hearsay, purely circumstantial, and irrelevant to defendant's alcohol elimination rate and blood alcohol concentration at the time of the accident. The State failed to prove the relevance of Glover's average data testimony. Glover had neither personal knowledge nor any foundation to testify that *defendant's* rate of eliminating alcohol from his body is 0.0165 per hour. *See Howerton*, 358 N.C. at 458, 597 S.E.2d at 686. Glover's opinion that *defendant's* blood alcohol concentration was 0.08 at the time of the accident was also without foundation. Defendant's breathalyzer test showed 0.05, well below the "0.08 or more" alcohol concentration required for conviction under the statute. N.C. Gen. Stat. § 20-138.1(a)(2) (2003).

Glover failed to show how another out of court individual's or the average of a group of other individuals' alcohol elimination rates were relevant to defendant's rate on the date of the accident. The trial court erred in admitting this testimony. *See Howerton*, 358 N.C. at 458, 597 S.E.2d at 686. Glover's use of a "conservative rate" does not cure the hearsay defect or establish relevancy. Glover also failed to lay a foundation by correlating the average rates to defendant's age, sex, height, weight, or any other physical characteristic to establish relevancy to be admitted into evidence. If Glover's testimony on average rates was the sole basis for the jury to return a guilty verdict on defendant's having a blood alcohol concentration of 0.08 or more, his conviction must be reversed.

## II. Presentation of Issues to the Jury

The trial court instructed the jury pursuant to N.C. Gen. Stat. § 20-138.1(a) (2003) that it should convict defendant if it found beyond a reasonable doubt that he operated a vehicle either: "under the influence of an impairing substance or had consumed sufficient alcohol that . . . defendant had an alcohol concentration of 0.08 or more . . . ." The issues, however, were not submitted to the jury separately. Further, the jury's verdict does not reflect which prong of the statute they found defendant violated. As defendant failed to request separate instructions, object to the trial court's instructions, assign error to the instructions, or argue plain error, this issue is not reviewable. Despite a clear indication in the record that the jury returned an unanimous verdict of either, or both, a 0.08 blood alcohol concentra-

tion or an appreciable impairment, defendant failed to preserve this error and waived his right to appellate review of the jury instructions. *See* N.C.R. App. P. 10(b)(2) (2004). Where the evidence shows defendant may have consumed a combination of alcohol and another impairing substance, the better practice is for the trial court to submit the issues separately to the jury to determine whether defendant operated a vehicle: (1) "[w]hile under the influence of an impairing substance;" or (2) "[a]fter having consumed sufficient alcohol that [defendant] has . . . an alcohol concentration of 0.08 or more." N.C. Gen. Stat. § 20-138.1(a)(1)-(2) (2003).

## III.  Conclusion

The trial court erred in admitting Glover's testimony of defendant's extrapolation rate and blood alcohol concentration based on irrelevant average data. Average data alone is hearsay, not relevant, and insufficient to prove defendant's alcohol extrapolation rate and blood alcohol concentration level at the time of the accident. Without proving the relevance of this average data as it relates to defendant's actual elimination rate, Glover lacked a foundation to offer this portion of his testimony. Defendant was denied his right to confront and cross-examine these hearsay declarations, which formed the basis for Glover's average data and were introduced to prove the truth of the matters asserted. In light of the other substantial evidence presented at trial and defendant's failure to object to the presentation of issues to the jury, this error was harmless.

Other testimony sufficiently supports the jury's conviction of defendant under N.C. Gen. Stat. § 20-138.1(a)(1) of driving "[w]hile under the influence of an impairing substance." *See State v. Coker*, 312 N.C. 432, 440, 323 S.E.2d 343, 349 (1984) (N.C. Gen. Stat. § 20-138.1 creates one offense that "may be proved by either or both theories."); *see also State v. Mark*, 154 N.C. App. 341, 346, 571 S.E.2d 867, 871 (2002), *aff'd*, 357 N.C. 242, 580 S.E.2d 693 (2003) ("The opinion of a law enforcement officer . . . has consistently been held sufficient evidence of impairment . . . ."). Trooper Davis testified that defendant smelled of alcohol, stared at him with a "blank face," fumbled through his papers, and needed assistance in getting to the patrol car. Trooper Davis also testified defendant was "swaying" during the "walk-and-turn" test, as well as during the "sway test." Trooper Davis found ten empty packages of Guaifenesin tablets on defendant. Glover testified as an expert on the combined effect of these tablets and alcohol. This evidence is sufficient to support

defendant's driving while impaired conviction under N.C. Gen. Stat. § 20-138.1(a)(1).

I concur in the result reached by the majority opinion and vote to sustain defendant's conviction.